## THE J. D. PETERS.

HOGAN et al. v. THE J. D. PETERS et al.

(District Court, N. D. California. December 18, 1896.)

No. 11,292.

1. SEAMEN'S WAGES—DEDUCTIONS AND OFFSETS—BURDEN OF PROOF.

Where the answer admits that the wages claimed have been earned, but claims deductions for payments on account and offsets, the burden is on the master to show such payments by preponderance of proof.

**2. SAME—SHIPPING ARTICLES IN COASTWISE TRADE—ALLOTMENTS.**

Repeals by implication are not favored. In the act of February 18, 1895, congress, in providing for the omission of item No. 8 of Rev. St. § 4511, relating to allotment of wages, in its application to the form and contents of shipping articles in the coastwise trade, did not repeal, by implication, the positive enactments of the acts of June 26, 1884 (23 Stat. 55), and June 19, 1886 (24 Stat. 80), permitting allotments.

**3. SAME—SLOP CHEST—PROFIT ON SALES.**

The provision in Act June 26, 1884, § 11, allowing but 10 per cent. profit on articles sold to seamen from the slop chest, on vessels mentioned in Rev. St. § 4569 (which mentions vessels bound on a voyage across the Pacific), will be applied, by analogy, to a sailing vessel on a voyage from our Pacific coast to Alaska, even though this be not considered a voyage across the Pacific.

**4. ESTOPPEL—OFFER TO COMPROMISE—SEAMEN'S WAGES.**

Pending a suit for seamen's wages, one of the libelants, needing money, wrote the master, offering to accept a certain sum in full payment, and saying that, if such sum was paid into court, the suit, so far as concerned his claim, might be dismissed. The sum was accordingly paid into court, but libelant never called for it, and subsequently pressed the suit for the full amount. *Held*, that his conduct did not prejudice his right to recover a larger sum.

Libel in rem for balances claimed for seamen's wages. Decree for libelants, after allowing claimants to deduct certain allotments authorized by section 10 of the act of June 26, 1884, as amended by section 3 of the act of June 19, 1886, in coasting voyages, and allowing a charge of 10 per cent. above the wholesale price for such articles of wearing apparel as were furnished by the master from the slop chest during the voyage to certain of the libelants.

H. W. Hutton, for libelants.

Geo. W. Towle, Jr., for claimants.

MORROW, District Judge. This is a libel in rem for balances claimed for seamen's wages. Libelants shipped before the shipping commissioner at Port Townsend, Wash., on board the bark J. D. Peters, for a voyage from Port Townsend to Port Clarence, Alaska, and back to San Francisco, via one or more ports on the Pacific coast. The shipping articles were introduced in evidence, and are in the usual form. The answer admits that the libelants earned the respective sums as alleged in their libel, but denies that the several balances claimed to be due, after allowing for certain allotments and the cost of slops furnished on the voyage, are correct, it being claimed that a much smaller sum is owing. The burden of proof, therefore, is on the claimants; for when wages are admitted to have been earned, but deductions are claimed for payments on account and other offsets, the burden of proof is on the master to show the payments, etc., by a preponderance of proof. The Fritheoff, 7 Sawy. 58, 14 Fed. 302; The Hunter, 11 Sawy. 426, 47 Fed. 744. As stated, the amounts in dispute relate to the validity of certain allotments paid by the owners, and deducted from the wages of libelants, and also with reference to the charges made by the master for certain articles of wearing apparel furnished from the slop chest to the libelants during the voyage.

All of the libelants, when they were shipped, appear to have represented to the master and the shipping officer at Port Townsend

that they were severally justly indebted to one Max Levy, for board and lodging, in the sum of $25, excepting the libelant E. Peterson, who claimed to be indebted only in the sum of $20. To secure the payments of these several indebtednesses, the libelants executed their several and separate allotment notes, payable in three monthly installments, two of the installments being for $10 each, and the third for $5. These allotment notes were executed in duplicate, and complied in all respects with the law relating thereto, and the regulations of the secretary of the treasury prescribed thereunder. The stipulations for these allotments were severally inserted in the shipping articles. The answer alleges that in due course of time, as they became due, they were paid. At the expiration of the voyage, in settling with the claims of libelants for their wages, it was sought to offset the several amounts paid on behalf of the libelants on their allotment notes against the respective amounts of the wages earned. Proctor for the libelants contends, however, that such allotments were and are void, and that the several amounts thereof cannot be deducted from libelants' wages. It is argued that all allotments for coasting voyages are, in effect, prohibited by the act of February 18, 1895 (28 Stat. 667), commonly known as the "Maguire Act," and that this act operates, by implication, to repeal section 10 of the act of June 26, 1884 (23 Stat. 55), as amended by section 3 of the act of June 19, 1886 (24 Stat. 80), which makes the payment of allotments lawful on being inserted in the shipping agreement, and subject to certain regulations prescribed by the secretary of the treasury. The proctor for claimants contends, on his side, that the act of February 18, 1895, was not intended to, and does not, repeal section 10 of the act of June 26, 1884, as amended by section 3 of the act of June 19, 1886, in so far as the validity of allotments is concerned. The question, therefore, to be determined, is whether or not, under the present state of the law, allotments in coasting voyages are lawful.

The purpose of the act of February 18, 1895, was, undoubtedly, to repeal certain sections of the Revised Statutes, imposing penalties and forfeitures upon merchant seamen, so far as the same had been made applicable to seamen engaged in the coastwise trade by the act of August 19, 1890 (26 Stat. 320), and to extend to them the beneficial provisions of certain other sections which are mentioned in the act of February 18, 1895. This is apparent from the text of the sections of the Revised Statutes, made applicable by the later act to the legal status of seamen shipped on coasting voyages. Most of them were enacted for the protection of the sailor, and affix penalties upon the master and owners for a failure to comply with their conditions and requirements. The act is entitled "An act to amend an act entitled 'An act to amend the laws relative to shipping commissioners,' approved August nineteenth, eighteen hundred and ninety, and for other purposes," and, so far as it is material to the present inquiry, reads as follows:

"When a crew is shipped by a shipping commissioner for any American vessel in the coastwise trade, or the trade between the United States and the dominion of Canada, or New Foundland, or the West Indies, or Mexico, as authorized by

section two of an act approved June nineteenth, eighteen hundred and eighty-six, entitled 'An act to abolish certain fees for official services to American vessels, and to amend the laws relating to shipping commissioners, seamen, and owners of vessels, and for other purposes,' an agreement shall be made with each seaman engaged as one of such crew in the same manner as is provided by sections four thousand five hundred and eleven and four thousand five hundred and twelve of the Revised Statutes, not however including the sixth, seventh and eighth items of section four thousand five hundred and eleven; and such agreement shall be posted as provided in section four thousand five hundred and nineteen."

It then provides that "such seamen shall be discharged and receive their wages" in accordance with certain other sections, and concludes as follows:

"But in all other respects such shipment of seamen and such shipping agreement shall be regarded as if both shipment and agreement had been entered into between the master of a vessel and a seaman without going before a shipping commissioner."

The act of June 19, 1890, differed from the present law, as just set forth, in that it made applicable to the coastwise trade certain sections of the Revised Statutes, relating to the agreement that should be made with each seaman when shipped by a shipping commissioner, and imposed penalties and forfeitures for the violation of the agreement by the seaman. It also provided that section 4511 of the Revised Statutes should be observed and applied in its entirety,—that is, not omitting the sixth, seventh, and eighth items thereof; nor was there the clause which is inserted at the end of the present law, that "in all other respects such shipment of seamen and such shipping agreement shall be regarded as if both shipment and agreement had been entered into between the master of a vessel and a seaman without going before a shipping commissioner."

Section 4511 of the Revised Statutes, with items 6, 7, and 8, provided as follows:

"The master of every vessel bound from a port in the United States to any foreign port other than vessels engaged in trade between the United States and the British North American possessions, or the West India Islands, or the republic of Mexico, or of any vessel of the burden of seventy-five tons or upward, bound from a port on the Atlantic to a port on the Pacific, or vice versa, shall, before he proceeds on such voyage, make an agreement, in writing or in print, with every seaman whom he carries to sea as one of the crew, in the manner hereinafter mentioned; and every such agreement shall be, as near as may be, in the form given in the table marked 'A,' in the schedule annexed to this title, and shall be dated at the time of the first signature thereof, and shall be signed by the master before any seaman signs the same, and shall contain the following particulars: First. The nature and, as far as practicable, the duration of the intended voyage or engagement, and the port or country at which the voyage is to terminate. Second. The number and description of the crew, specifying their respective employments. Third. The time at which each seaman is to be on board, to begin work. Fourth. The capacity in which each seaman is to serve. Fifth. The amount of wages which each seaman is to receive. Sixth. A scale of the provisions which are to be furnished to each seaman. Seventh. Any regulations as to conduct on board, and as to fines, short allowance of provisions, or other lawful punishments for misconduct, which may be sanctioned by congress as proper to be adopted, and which the parties agree to adopt. Eighth. Any stipulations in reference to advance and allotment of wages, or other matters not contrary to law."

It is with the last or eighth item of the above section, which the act of February 18, 1895, provides shall be omitted, that we are

concerned. Before considering the effect of this omission, it is necessary to state that section 4511 of the Revised Statutes applied only to foreign voyages, and did not include coasting voyages. The only provision in the Revised Statutes, relating to the form of the shipping agreement, that did apply to coasting voyages, was section 4520; but that section applied to coasting voyages other than between adjoining states, and only related to the fact that the shipping agreement should state the voyage or term of time for which a seaman was shipped. It did not require that any of the other particulars enumerated in section 4511 should be set forth. But section 2 of the act of June 19, 1886, entitled "An act to abolish certain fees for official services to American vessels, and to amend the laws relating to shipping commissioners, seamen and owners of vessels, and for other purposes," provided that seamen shipped on vessels engaged in the coastwise trade might be shipped by a shipping commissioner. It is to be observed that this act was not mandatory, and did not require seamen to ship before a shipping commissioner. However, it was deemed advisable that if the master or crew, from motives of convenience or otherwise, should desire to ship before a shipping commissioner, they should be able to do so; and it was for this reason that the authority of the shipping commissioner was thus enlarged. The act of June 19, 1890, required that, when a crew was shipped by a shipping commissioner for any American vessel in the coastwise trade, an agreement should be made with each seaman in the same manner as is provided by sections 4511 and 4512 of the Revised Statutes. The act of February 18, 1895, requires that an agreement shall be made with each seaman in the same manner as is provided by sections 4511 and 4512, "not including however the 6th, 7th, and 8th items of section 4511." From this change in these two statutes, the proctor for libelants seeks to deduce the conclusion that congress intended to prohibit absolutely all allotments to seamen in the coastwise trade. The law with respect to allotments was not provided for in the Revised Statutes, but was enacted in section 10 of the act of June 26, 1884, as amended by section 3 of the act of June 19, 1886, which provided that:

"It shall be lawful for any seaman to stipulate in the shipping agreement for an allotment of all or any portion of the wages which he may earn to his wife, mother, or other relative, or to an original creditor in liquidation of any just debt for board or clothing which he may have contracted prior to engagement, not exceeding ten dollars per month for each month of the time usually required for the voyage for which the seaman has shipped, under such regulations as the secretary of the treasury may prescribe, but no allotment to any other person shall be lawful."

This law had been in force for over 10 years, when the act of February 18, 1895, was passed. That act does not expressly repeal the act of 1884, as amended by the act of 1886, relating to allotments. No reference whatever is made to those acts. Whatever of repeal there may therefore be must be by implication. But repeals by implication are not favored. The general rule is that there will be no such repeal if it is possible to reconcile the two acts.

Sutherland, in his work on Statutory Construction, beginning at page 205, thus states the rule:

"If two statutes can be read together without contradiction or repugnancy or absurdity or unreasonableness, they should be read together, and both will have effect. It is not enough to justify the inference of repeal that the later law is different. It must be contrary to the prior law. It is not sufficient that the subsequent statute covers some or even all the cases provided for by the former, for it may be merely affirmative, accumulative, or auxiliary. There must be some positive repugnancy; and even then the old law is repealed by implication only to the extent of the repugnancy. If, by fair and reasonable interpretation, acts which are seemingly incompatible or contradictory may be enforced, and made to operate in harmony and without absurdity, both will be upheld, and the later one will not be regarded as repealing the others by construction or intendment. As laws are presumed to be passed with deliberation, and with a full knowledge of all existing ones on the same subject, it is but reasonable to conclude that the legislature, in passing a statute, did not intend to interfere with or abrogate any former law relating to the same matter, unless the repugnancy between the two is irreconcilable."

See McCool v. Smith, 1 Black, 459.

There is a further rule of statutory construction, which is important in this case. It is that:

"One statute is not repugnant to another unless they relate to the same subject, and are enacted for the same purpose. When there is a difference in the whole purview of two statutes apparently relating to the same subject, the former is not repealed." Suth. St. Const. p. 181, citing Rex v. Downes, 3 Term R. 569; Bowen v. Lease, 5 Hill, 221, 225; U. S. v. Claflin, 97 U. S. 546; U. S. v. Gear, 3 How. 120; Miller v. Edwards, 8 Colo. 528, 9 Pac. 632.

Such being the well-settled rules of statutory construction which should apply, the question arises whether the act of February 18, 1895, providing for the omission of item No. 8 of section 4511 of the Revised Statutes, operates, by implication, to repeal the act of 1884 as amended by the act of 1886, relating to allotments. In the first place, do these different acts relate to the same subject, and were they enacted for the same purpose? Clearly not. The purpose of section 4511 of the Revised Statutes was to provide what the shipping articles or agreement should contain, and the section was imperative in its demands that it should state, among other things, "any stipulations in reference to advance and allotment of wages, or other matters not contrary to law." Obviously, it simply related to the form and contents of the shipping agreement. It did not purport to provide what the law should be with reference to the several particulars required to be stated in the shipping agreement. These particulars or stipulations were, undoubtedly, subject to such laws as existed at that time or might subsequently be passed. The act of 1884, as amended by that of 1886, had, however, a different purpose, and related to a different subject. It did not relate primarily to the form and contents of the shipping agreement, nor did it pretend to legislate with respect to the duties of the shipping commissioner so far as the stipulations in the shipping agreement were concerned. It legislated upon, and was confined specifically to, advances and allotments, the former of which it prohibited absolutely, and the latter it permitted to a limited extent, and subject to certain regulations to be prescribed by the secretary of the treasury. Section 4511, Rev. St., had refer-

ence to the form of the shipping agreement so far as any stipulations with respect to allotments were concerned; while the subsequent acts referred to legislated specifically upon the right of a seaman to make an allotment. The latter law, if it did anything, certainly limited the eighth item of section 4511, for that item had reference to any stipulations that might be agreed upon between the master and seaman, while the acts referred to provided that only certain stipulations with reference to allotments should be valid. It would seem, therefore, that when the act of February 18, 1895, was passed, providing that item No. 8 should be omitted from section 4511 in its applicability to the agreement to be made between the master and each seaman, it did not affect the right to make an allotment under the conditions prescribed by the act of 1884, as amended by the act of 1886. In other words, it does not repeal these two acts by implication. To say that item No. 8 of section 4511, Rev. St., should be omitted from the agreement, and to say that there should not be any allotments of wages in coasting voyages, are two different things entirely. The act of February 18, 1895, certainly does not say the latter, although it may have been intended to do so; and to hold that congress, in providing for the omission of item No. 8 from section 4511, actually repealed the positive enactments contained in the acts of 1884 and 1886, would, I think, be giving to the language of the act of February 18, 1895, an interpretation not authorized by any of the established rules of statutory construction. Upon a close reading of the act under consideration, it will be seen that it does not even say that any stipulations with reference to allotments shall be omitted or not incorporated in the shipping agreement. It simply says that section 4511, Rev. St., so far as items 6, 7, and 8 are concerned, is not made applicable to the form of the shipping agreement when a seaman ships for a coasting voyage before a shipping commissioner. What, then, was the object and purpose of congress, in providing, in the act of February 18, 1895, that items 6, 7, and 8 should be omitted from section 4511 in its applicability to the shipping agreement? I think, from a consideration of the various acts referred to, that it deemed section 4511, so far as items 6, 7, and 8 were concerned, obsolete, unnecessary, and superfluous legislation. This is especially true with respect to item No. 8.

Furthermore, the act of 1884, as amended by the act of 1886, practically required that the stipulation as to allotments should be contained in the shipping agreement. We therefore have a legislative enactment, aside from item No. 8 of section 4511, requiring the stipulation as to allotments to be entered in the shipping agreement. Any requirement to that effect in section 4511 was therefore unnecessary and useless. But item No. 8 was not only unnecessary and useless, but it was in conflict with the law respecting advances, as declared in the act of June 26, 1884. That act absolutely prohibited any advances. The provision in item No. 8 that all stipulations respecting advances should be contained in the shipping agreement was therefore not only useless, but in conflict with the law as subsequently enacted. In brief, the purpose and object of

the act of February 18, 1895, seems to have been to make section 4511 applicable only in so far as the laws relating thereto warranted. It was additional legislation, with a view to making the stipulations in the shipping agreement, so far as coastwise voyages were concerned, conform to the law as it stood at the time of its enactment with reference to allotments.

It is contended, further, by the proctor for libelants, that, if the omission of item No. 8 of section 4511 be given its full effect, it will result that no stipulations can be inserted in the shipping agreement respecting allotments. Such a conclusion does not necessarily follow. Besides, as stated before, it is nowhere provided that a stipulation respecting allotments shall not be entered into, or, if entered into, that it shall be null and void. But, even if such a forced and strained conclusion could be arrived at, there is a saving clause in the act in question, which would permit of stipulations as to allotments. The clause referred to is contained at the end of the act of February 18, 1895, and has been recited before. After providing for the omission of items 6, 7, and 8, it provides:

"But in all other respects such shipment of seamen and such shipping agreement shall be regarded as if both shipment and agreement had been entered into between the master of a vessel and a seaman without going before a shipping commissioner."

This, in effect, is tantamount to providing that master and seamen may contract for allotments. Of course, this right is subject to such restrictions as congress has seen fit to impose, which, we have seen, are contained in the act of 1884, as amended by the act of 1886. In other words, this clause preserves to master and seamen the right to enter into such contractual relations not otherwise provided for by the sections of the Revised Statutes made applicable to seamen shipping in the coastwise trade, and not contrary to law. In fact, when we scrutinize closely the terms of item No. 8 of section 4511 with this clause of the act of February 18, 1895, we will find that the latter was undoubtedly intended also as the substitute for that part of item No. 8 which provides that "any stipulations" "not contrary to law" should be inserted in the shipping agreement.

Counsel for libelants has referred to several expressions of opinion by the secretary of the treasury, made in the course of official communications, which tend to support the view that the act of February 18, 1895, in providing for the omission of item No. 8 from section 4511, operates to repeal the acts of 1884 and 1886, which permit allotments. It is claimed that these expressions of opinion are controlling on the court, and the general rule is cited that, "in all cases of ambiguity, the contemporaneous construction, not only of the courts, but of the departments, and even of the officials whose duty it is to carry the law into effect, is universally held to be controlling." Schell's Ex'rs v. Fauche, 138 U. S. 562–572, 11 Sup. Ct. 376. See, also, Railway Co. v. Phelps, 137 U. S. 528–536, 11 Sup. Ct. 168; Merritt v. Cameron, 137 U. S. 542–552, 11 Sup. Ct. 174; The Eclipse, 53 Fed. 273–279; Id., 8 C. C. A. 505, 60 Fed. 105.

But this rule does not render the ruling of an official absolutely conclusive of the question, and prevent its re-examination in a court of justice, where the question is presented pro and con, and subjected to searching and painstaking judicial investigation. It applies, properly speaking, to a case of ambiguity. But in the case at bar, after a careful consideration and mature reflection, I am satisfied that any ambiguity that may exist is more apparent than real; and I conclude that congress, in providing for the omission of item No. 8 of section 4511 in its application to the form and contents of the shipping agreement in the coastwise trade, did not repeal the positive enactments permitting allotments contained in the acts of 1884 and 1886.

It is further claimed that, even if the libelants could lawfully stipulate in their agreement for an allotment, the amount agreed to be paid was in excess of that allowed by the regulations of the secretary of the treasury. Under section 3 of the act of 1886, allotments to original creditors cannot be made to exceed $10 per month for the time usually required for the voyage for which he has shipped, under such regulations as the secretary of the treasury may prescribe. In accordance with the spirit of the act, the secretary of the treasury, on June 21, 1886, issued a schedule of voyages for sailing vessels. See Synopsis of Decisions for 1886, No. 7,594, at page 277. It is therein provided that for coasting voyages, except between Atlantic and Pacific ports, including voyages from first coasting district to Atlantic ports in the dominion of Canada, an allotment not to exceed $5 for each half month shall be paid. This would amount to $10 for a month, as to voyages consuming that length of time. The allotment in the case at bar was $10 a month for the first two months, and $5 additional for the third month, or a sum total of $25, excepting the libelant Peterson, whose total allotment amounted to $20. The voyage took almost four months. The allotments, therefore, seem to have been properly allowanced, and do not appear to exceed the scheduled amount prescribed by the secretary of the treasury. They should be deducted from libelants' wages.

We now come to the question as to the value of the wearing apparel furnished to most of the libelants by the master during the voyage. It is claimed by libelants that they were practically compelled to procure articles of wearing apparel from the slop chest, and that the captain dictated his own terms. The testimony tends to show that the captain did not disclose to libelants what he intended to charge them for the articles furnished them at the time. It was only when the voyage was completed, and their balances of wages had been calculated and tendered them, that they learned of the prices that the captain had charged them. The captain denies that he overcharged libelants, and states that they procured the articles voluntarily, and with full knowledge of what the price therefor would be. It is, however, unnecessary to enter into details. The question with which we are chiefly concerned is as to the price of the articles supplied. Section 11 of the act of June 26, 1884 (23 Stat. 56), provides that every vessel mentioned in section 4569

of the Revised Statutes shall be provided with a slop chest, which shall contain a complement of clothing for the intended voyage for each seaman employed, including boots or shoes, hats or caps, under-clothing and outer-clothing, oiled clothing, and everything necessary for the wear of a seaman; also, a full supply of tobacco and blankets. Any of the contents of the slop chest shall be sold, from time to time, to any or every seaman applying therefor, for his own use, at a profit not exceeding 10 per centum of the reasonable wholesale value of the same at the port at which the voyage commenced. Section 4569 of the Revised Statutes applies to every sailing vessel bound on a voyage across the Pacific Ocean, etc. It is claimed by proctor for respondents that this law is inapplicable to the present case, because the vessel did not sail across the Pacific Ocean in making a voyage from Port Townsend to Port Clarence, Alaska. This is controverted by proctor for libelants, who claims that, to all intents and purposes, the bark J. D. Peters crossed the Pacific Ocean when she traveled from Port Townsend, Wash., to Port Clarence, Alaska, owing to the gradual and regular contraction of the parallels of longitude as these approach the North Pole. But, irrespective of whether the statute in question is applicable to the voyage in this case, I should apply, by analogy, the rule of 10 per cent., contained in the statute, as being a just and equitable rule to follow. It seems to have been followed and applied in the same manner in other cases in this court. See The Hunter, 11 Sawy. 426, 47 Fed. 744. The evidence shows that the captain charged the libelants more than 10 per cent. on the wholesale price. A witness was introduced on the part of the libelants who appeared to be very familiar with the wholesale and retail prices of articles of wearing apparel similar to those sold to libelants. His testimony impressed the court as fair and trustworthy, and he was not successfully impeached or contradicted. From his statements it appears that the captain made exorbitant charges for the articles he furnished to the libelants. Some of these articles were brought into court, and identified. The captain, in his testimony, protested that some of these articles were not the same he had sold to libelants, and must have been procured elsewhere; but I am compelled to accept the statements of the libelants as being the more reliable. The articles produced were examined by the expert witness referred to, and he gave it as his opinion that they were of poor quality, and very cheap. In some instances the captain charged as much as 300 to 400 per cent. above the wholesale price of the articles. I have carefully gone over the slop account of each libelant, and made such reductions as seemed, under the testimony, fair and proper. As to a few of the articles, there is no testimony of their wholesale value, the expert witness declining to give an opinion, on the ground that he was not sufficiently familiar with the article and its price to justify him in so doing. For instance, this is true of a coat sold from the slop chest to one of the libelants; also, with reference to soap, matches, and other small articles furnished. With respect to these, I have made a reduction of percentage substantially in proportion to that made respecting the other articles.

I may say, however, that I have not followed strictly the 10 per cent. rule, but in almost every instance have given the claimant the benefit of the higher retail price in this city testified to by the expert witness. The result of my calculations, with the sums due the respective libelants, is as follows:

| | | |
|---|---:|---:|
| William Hogan, seaman, wages earned.................... | | $ 97 40 |
| Allotment ............................ | $25 00 | 25 00 |
| Balance due ............................................ | | $ 72 40 |
| (No slops seem to have been furnished to the above libelant.) | | |
| Henry Kroger, seaman, wages earned.................... | | $ 97 40 |
| Allotment .............................. | $25 00 | |
| Slop acct. .............................. | 18 45 | 43 45 |
| Balance due ............................................ | | 53 95 |
| Hermann Golowin, seaman, wages earned................ | | $ 97 40 |
| Allotment .............................. | $25 00 | |
| Slop acct. .............................. | 20 50 | 45 50 |
| | | 51 90 |
| E. Peterson, seaman, wages earned..................... | | $ 97 40 |
| Allotment .............................. | $20 00 | |
| Slop acct. .............................. | 8 65 | 28 65 |
| Balance due ............................................ | | 68 75 |
| George Backel, seaman, wages earned.................. | | $ 97 40 |
| Allotment .............................. | $25 00 | |
| Slop acct. .............................. | 18 25 | 43 25 |
| Balance due ............................................ | | 54 15 |
| William Grosett, seaman, wages earned................. | | $ 97 40 |
| Allotment .............................. | $25 00 | |
| Slop acct. .............................. | 16 50 | 41 50 |
| | | 55 90 |
| Alexander Holmburg, seaman, wages earned............. | | $ 97 40 |
| Allotment .............................. | $25 00 | |
| Slop acct. .............................. | 21 45 | 46 45 |
| Balance due ...... | | 50 95 |
| Karl V. Ross, carpenter, wages earned.................. | | $136 00 |
| Slop acct., including a charge of $7 for a plow plane .............................. | $33 00 | |
| Cash advanced in San Francisco........... | 5 00 | 38 00 |
| | | 98 00 |
| Henry Venzuela, seaman, wages earned................ | | $ 97 40 |
| Allotment .............................. | $25 00 | |
| Slop acct. .............................. | 18 20 | 43 20 |
| Balance due ............................................ | | 54 20 |
| Total .......................................... | | $560 20 |

The point is made by proctor for claimants that libelant Ross is estopped from recovering more than the sum of $56.58, which sum was left with the clerk of the court by the claimants on October 27, 1896. A letter was introduced at the hearing, signed by Ross, and addressed to the master in San Francisco, in which he states, substantially, that he is willing to accept the sum of $56.58 in full payment of all sums due him for services rendered on the bark during the voyage in question, and that, if that sum were paid into court, the suit, so far as his claim was concerned, might be dis-

missed. As stated, the sum of $56.58 was left by the claimants with the clerk of the court, to be by him paid to the libelant Ross; but the latter, it appears, has never called for the same, nor availed himself of it. On the contrary, he appeared as a witness in his own behalf at the hearing, seeking to recover the amount he originally sued for. He testified that the reason for applying to the master for a settlement and for signing the letter referred to was because he was then in need of money, and wanted to leave San Francisco. For some reason or other, he was subsequently induced to change his mind, and he never called for the sum left with the clerk of the court. I do not see how his action in this respect can prejudice his right to recover the sum which the court finds is actually due him. It is true that he agreed at one time to accept a smaller sum, but this was owing to the fact that it was in the nature of a settlement, which, he states, he was then anxious to bring about, being in need of money. He will therefore be allowed the full amount of $98.

A decree will be entered as indicated in this opinion.